Opinion issued June 29, 2006 

















In The

Court of Appeals

For The

First District of Texas






NO. 01-05-00499-CR

__________


CECIL RAY HENDERSON, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 208th District Court

Harris County, Texas

Trial Court Cause No. 932,475






MEMORANDUM OPINION

 A jury found appellant, Cecil Ray Henderson, guilty of the offense of capital
murder. (1) Because the State did not seek the death penalty, the trial court
automatically assessed his punishment at confinement for life. (2)
 In five points of
error, appellant contends that the trial court erred in admitting into evidence 
gruesome photographs, the trial court erred in denying his motion to suppress his
videotaped statement, and his trial counsel was ineffective when he failed to object
to inadmissible victim character testimony and to the admission of hearsay
documents. 

 We affirm.

Facts

 Houston Police Officer M. Garcia testified that on December 2, 2002, he was
dispatched to a robbery and met with two witnesses, Natalie Reyes and Carmen
Flores. Reyes and Flores told Garcia that the complainant, known by the women as
"Mr. Barry," was robbed while working in his ice cream truck in front of Reyes's
house. Reyes told Garcia that firearms had been used in the robbery, that the
complainant's truck had been taken by three suspects, and that the complainant might
still be inside the truck. Reyes also told Garcia that the complainant's ice cream truck
had a picture of Jesus on the side of it, and Garcia relayed this information to a police
dispatcher. Garcia also recovered a shell casing in front of Reyes's house. 
Approximately one hour later, Houston Police Officer R. Plotner located the
complainant's ice cream truck burning in an industrial area. Garcia drove to the
scene, and he saw the complainant's body lying face down inside his burned truck. Natalie Reyes testified that on that night, she and her sister, Carmen Flores,
went outside Reyes's house with her children to buy ice cream from the complainant. 
While she was outside, she saw four males standing near the complainant's truck and
a blue Oldsmobile parked nearby. When Reyes went back inside her house, she heard
what she thought was a firecracker. She looked out her window, heard noises like
kicking and someone climbing into the truck's window, and saw two men inside the
truck fighting with the complainant. She heard gunshots and called for emergency
assistance. She then saw the complainant's truck drive away at a fast speed, followed
by the blue Oldsmobile.

 Tomas Garcia, a security officer, testified that on that night, he was working
in the industrial area where the complainant's truck was eventually located. He saw
a blue car drive by very slowly, and then he saw what he thought was a taco truck. 
He subsequently saw some men pushing the blue car, heard an explosion, and went
outside and saw the complainant's truck on fire.

 Houston Fire Department Arson Division Crime Lab Supervisor T. Wood
testified that in the early morning hours of December 3, 2002, he was dispatched to
the location where the complainant's truck was burning. He took photographs, 
obtained physical evidence, and found evidence indicating that the fire was
intentionally set.

 John Robinson, who knew appellant from the neighborhood, testified that in
the early morning hours of December 3, 2002, Jermaine Apollo Thomas, Isaiah
Gooden, Tristan Terry, and appellant came to his house. Appellant told Robinson
that a blue Oldsmobile that they had been driving would not start, and appellant asked
Robinson's son, John Bradford, to help them with their car. Bradford helped
appellant and the others with their car. At some point, Robinson also saw appellant
attempt to put a plastic bag under his deck. He suspected that the bag contained
drugs, but appellant told him it was money. When Robinson objected to appellant's
placing the bag under his deck, appellant got the bag and then the four men drove
away in their car. The next morning, Robinson learned of the criminal events of the
previous evening and called Crimestoppers. 

 John Bradford testified that, on the morning of December 3, 2002, after
appellant and Thomas, Gooden, and Terry came to his father's house, he went to get
gas for their car. When he returned from getting gas, appellant and the others were
hiding. Gooden had a gun and told Bradford that he had killed someone. Bradford
also noticed that inside the car there were boxes containing potato chips and candy
stacked up to the car's roof. Once the men got their car started, appellant got out of
the car and retrieved something from under Robinson's porch, and the men left in
their car.

 Houston Police Officer B. Harris testified that he received a tip from
Crimestoppers and spoke with Robinson and Bradford. Harris then obtained an arrest
warrant for Gooden. When police officers arrested Gooden, they found the
complainant's credit cards and driver's license in Gooden's jacket. Police officers
also recovered the blue Oldsmobile and found items like those sold by the
complainant inside the car. When officers subsequently arrested Thomas and Terry,
they found a gun that was determined to be the murder weapon at the house of
Thomas's girlfriend. Appellant subsequently surrendered himself to Harris County
Deputy Constables. Officer Harris then interviewed and interrogated appellant, and
appellant provided a videotaped statement, which was introduced into evidence
during his trial. During his statement, appellant gave somewhat conflicting stories,
but admitted to his participation in the robbery of the complainant. Appellant
identified Gooden as the man that shot the complainant. Appellant stated that after
Gooden had first shot the complainant, appellant told Gooden that the complainant
was not dead and that Gooden needed to "go back" and "finish him." Gooden then
shot the complainant two more times.

Photographic Evidence 

 In his first point of error, appellant argues that he was denied a fair trial
because the trial court admitted gruesome photographs into evidence. He asserts that
the photographs were not relevant and prevented the jury from rendering an unbiased
judgment based on properly admitted evidence. He complains of the admission of
"numerous gruesome photographs of the [complainant's] body at the scene" and of
"numerous grisly photographs of the [complainant's] autopsy." Appellant contends
that the photographs were particularly prejudicial because of their repetitiveness.

 At trial, appellant objected to seven crime scene photographs, labeled State's
exhibits 22, 24, 27-30, and 56, which depicted the complainant's burned body and
truck, on the grounds that these photographs were not related to the capital murder
indictment and that they were "just generally gruesome." The State argued that
although arson was not part of the capital murder charge, the photographs were
relevant and not unfairly prejudicial because they showed "part of the conduct of all
of the defendants throughout the entire episode," including the taking of property
from the complainant's truck and the destruction of evidence. The State further noted
that the photographs showed the extent of the burning of the interior of the truck and
were relevant to appellant's mental state in trying to destroy evidence related to his
guilt. The State also asserted that some of the photographs provided different angles
and views of the crime scene. The trial court excluded part of one of the photographs,
but overruled appellant's objections to the remaining photographs. The trial court
noted that the burning of the truck and the complainant's body were all part of one
event, that four of the crime scene photographs showed bullet entry or exit wounds
on the complainant's body, and that the photographs were, thus, more probative than
prejudicial. Arson investigator Wood used these photographs during his testimony
explaining the origin of the fire in the truck and the resulting damage to the truck and
its contents.

 At trial, appellant also objected to seven autopsy photographs, labeled State's
Exhibits 88-94. Appellant argues that the admission of these photographs was
improper because he never contested the fact that the complainant died as a result of
gun shot wounds. The trial court sustained appellant's objection to State's Exhibit
88, a close up of photograph of the complainant's head, but admitted the other
photographs, which showed different views of the wounds on the complainant's
body. R. Milton, an assistant medical examiner, used these photographs during his
testimony about the complainant's wounds and cause of death.

 We review a trial judge's decision to admit evidence for an abuse of discretion.
Narvaiz v. State, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992). We note that crime
scene photographs are almost always relevant because they "depict[] the reality of
[the] offense," and may show the manner in which it occurred. Chamberlain v. State,
998 S.W.2d 230, 237 (Tex. Crim. App. 1999). We further note that autopsy
photographs are generally admissible, unless they depict mutilation of the victim
caused by the autopsy itself. Hayes v. State, 85 S.W.3d 809, 816 (Tex. Crim. App.
2002); Rojas v. State, 986 S.W.2d 241, 249 (Tex. Crim. App. 1998). 

 Relevant evidence may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or misleading
the jury, or by considerations of undue delay or needless presentation of cumulative
evidence. Tex. R. Evid. 403. However, rule 403 favors admissibility and contains
a presumption that relevant evidence is more probative than prejudicial. Hayes, 85
S.W.3d at 815. A rule 403 analysis should include, but is not limited to, the
following factors: (1) how probative the evidence is; (2) the potential of the evidence
to impress the jury in some irrational, but nevertheless indelible way; (3) the time the
proponent needs to develop the evidence; and (4) the proponent's need for the
evidence. Montgomery v. State, 810 S.W.2d 372, 389-90 (Tex. Crim. App. 1991). 
In determining the prejudicial effect of photographs, a court should consider (1) the
number of photographs, (2) the size of the photographs, (3) whether they are in color
or black and white, (4) the detail shown in the photographs, (5) whether the
photographs are gruesome, (6) whether a body shown in the photographs is naked or
clothed, and (7) whether the photographed body has been altered since the crime in
some way that might enhance the gruesomeness of the photograph to the appellant's
detriment. Reese v. State, 33 S.W.3d 238, 241 (Tex. Crim. App. 2000). Photographs
provide powerful visual evidence of the offense, and a trial court does not abuse its
discretion in admitting photographs of a victim into evidence merely because they
may be gruesome. Sonnier v. State, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995). 

 State's exhibits 27, 28, 29, and 30 are close-up photographs showing the
complainant's gun shot wounds. State's exhibits 22 and 24, as well as State's exhibit
56, as modified by the trial court, are taken from different angles and show views of
the burned interior of the truck, the contents of the truck, and the complainant's body
inside the truck. Finally, State's Exhibits 89-94 are autopsy photographs depicting
fairly close-up views of the complainant's wounds. In regard to State's exhibits 22,
24, 27-30, and 56, we conclude that these photographs were probative of the crime
scene and the injuries received by the complainant. The crime scene photographs
illustrate that appellant and the others involved in the crime attempted to destroy any
incriminating evidence left in the complainant's truck. Additionally, appellant does
not contend that these photographs are any more gruesome than the crime scene as
it was found by police officers. In regard to the autopsy photographs, we note that
they do not depict any mutilation of the complainant's body caused by the autopsy
itself. Long v. State, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991). Like the crime
scene photographs, these photographs show only the injuries that the victim received
and are no more gruesome than would be expected. See id. Furthermore, the
photographs, which were taken from different angles, were not cumulative or
repetitive. Accordingly, we hold that the photographs were relevant, that they were
not overly gruesome, and that the trial court did not abuse its discretion in admitting
these photographs into evidence on the grounds that the danger of unfair prejudice
did not substantially outweigh the probative value of the photographs. 

 We overrule appellant's first point of error.

Motion to Suppress Statement

 In his second point of error, appellant argues that the trial court erred in
denying his motion to suppress his videotaped statement because he asked for a
lawyer before giving the statement. In his third point of error, appellant contends that
the trial court erred in denying his motion to suppress his videotaped statement
because the videotaped statement does not contain an express waiver of appellant's
rights, and that, under the Texas Code of Criminal Procedure, "the tape must be
rolling" when appellant waives his rights. See Tex. Code Crim. Proc. Ann. art.
38.22(3)(a)(2) (Vernon Supp. 2005). 

 We review a trial court's denial of a motion to suppress a custodial statement
for an abuse of discretion. Wood v. State, 18 S.W.3d 642, 646 (Tex. Crim. App.
2000). The trial court is the sole judge of the credibility of witnesses and the weight
of their testimony. Wyatt v. State, 23 S.W.3d 18, 23 (Tex. Crim. App. 2000) (citing
Penry v. State, 903 S.W.2d 715, 744 (Tex. Crim. App. 1995)). We afford almost total
deference to the trial court's determination of the facts, especially when that
determination is based on issues of credibility and demeanor. State v. Ross, 32
S.W.3d 853, 856 (Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex.
Crim. App. 1997). We apply the same deference in reviewing the trial court's rulings
on mixed questions of law that turn upon a credibility evaluation. Id. If a mixed
question of law and fact does not turn on a witness's credibility and demeanor,
however, we review the trial court's determination de novo. Id.

 In reviewing a trial court's ruling, we generally consider only evidence
adduced at the suppression hearing because the ruling was based on it rather than
evidence introduced later. Rachal v. State, 917 S.W.2d 799, 809 (Tex. Crim. App.
1996). However, this general rule is inapplicable where the suppression issue has
been consensually re-litigated by the parties during the trial on the merits. Id. Where
the State raises the issue at trial without objection or with subsequent participation
on the inquiry by the defense, the defendant has made an election to re-open
evidence, and consideration of the relevant trial testimony is appropriate in our
review. Id. In the instant case, because appellant did not object when the State
reintroduced the suppression issues at trial and, indeed, fully participated in the
re-litigation of the issues, we may properly consider the witnesses' trial testimony in
our review of the trial court's suppression ruling.

Right to a lawyer

 In regard to appellant's second point of error, an accused has the right to have
a lawyer present prior to and during any questioning. See Tex. Code Crim. Proc.
Ann. art. 38.22(2)(a)(3) (Vernon Supp. 2005). When an accused requests an attorney,
all questioning must cease. Edwards v. Arizona, 451 U.S. 477, 485, 101 S. Ct. 1880,
1885 (1981); Cobb v. State, 85 S.W.3d 258, 263 (Tex. Crim. App. 2002).

 Appellant notes that at the motion to suppress hearing, Lafeshe Coleman,
appellant's girlfriend, testified that she was with appellant on the night that he
surrendered himself to the constables. She stated that she instructed appellant not to
speak unless he had a lawyer and that the deputy constables heard her instructions. 
Marsha Henderson, appellant's mother, testified that she arranged for appellant to
surrender himself to Deputy Constable Barnett because she trusted Barnett. She told
Barnett that appellant was not to talk until he had a lawyer, and she made appellant
repeat her instructions to Barnett.

 However, all the officers who spoke with appellant after he surrendered himself
testified that appellant did not ask for a lawyer. Houston Police Officer B. Harris
testified that after appellant surrendered himself to two Harris County Deputy
constables, he conducted a preliminary interview with appellant and advised him of
his rights. Appellant confirmed to Harris that he understood his rights and agreed to
waive his rights. Harris further stated that appellant did not request an attorney at any
time. In fact, appellant told Harris that he wanted to make a videotaped statement,
and the officers then recorded the statement.

 Houston Police Officer B. McDaniel testified that he was present when Deputy
Constables Barnett and C. Lofland brought appellant into the police station, that he
placed appellant in an interview room and read him his legal rights, and that appellant
said that he understood his rights. McDaniel videotaped appellant's statement. 
McDaniel stated that when Harris began speaking with appellant during the
preliminary interview, Harris informed appellant of his legal rights, that appellant
acknowledged that he understood those rights, and that when appellant gave his
videotaped statement Harris again gave appellant his legal warnings. McDaniel never
heard appellant ask for an attorney.

 Deputy Constable Barnett did not testify at the motion to suppress hearing
because he had suffered a stroke and experienced memory loss. However, at trial,
Barnett testified that he was regaining his long term memory, that he had a "full
memory" of the events of December 9, 2002, the night that appellant surrendered
himself, and that appellant never asked for a lawyer. Barnett also denied that
appellant's mother or girlfriend had ever asked for a lawyer. He further stated that
if appellant had asked for a lawyer, he would have included that information in his
report. Deputy Constable Lofland also testified at trial, and stated that appellant
never asked for a lawyer and that if appellant had asked Barnett for a lawyer, he
would have expected Barnett to tell him.

 The trial court denied appellant's motion to suppress the videotaped statement
and subsequently entered the following pertinent findings and conclusions:

 [Appellant] was read the statutory warnings pursuant to Tex.
Code Crim. Proc. art. 38.2 prior to making his statement. The rights
were read in the patrol car before travel to the police [station] and at the
police station three more times prior to custodial interrogation of the
[appellant].


 The statutory warnings concerned the following: (1) his right to
remain silent and not make any statement at all and that any statement
he made may be used against him and probably will be used against him
at his trial; (2) any statement he made may be used as evidence against
him in court; (3) he had the right to have a lawyer present to advise him
prior to and during any questioning; (4) if he was unable to employ a
lawyer, he had the right to have a lawyer appointed to advise him prior
to and during any questioning; and (5) he had the right to terminate the
interview at any time.


 [Appellant] understood the rights set out in [the paragraph] above,
including that the statement may be used against him.


 The rights contained in [the paragraph] above are contained on the
videotaped statement of the [Appellant] and the [Appellant]
intelligently, knowingly, and voluntarily waive[d] those rights as set out
in [the paragraph above] on his videotaped statement.


The court further found that McDaniel, Harris, and Lofland were credible witnesses,
that McDaniel and Lofland's testimony that appellant never asked for a lawyer was
true, that Coleman and Henderson were not credible witnesses, and that Henderson's
testimony that appellant asked for a lawyer in Barnett's and Lofland's presence was
not true. 

 Here, at the suppression hearing, the officers who were with appellant on the
night appellant surrendered himself testified that appellant never requested an
attorney, that appellant received his legal warnings numerous times, that appellant
acknowledged that he understood his rights, and that he voluntarily provided a
videotaped statement. The only evidence that appellant requested an attorney was
appellant's mother's testimony that she made appellant repeat her request to Deputy
Constable Barnett that appellant wanted to speak with a lawyer and appellant's
girlfriend's testimony that she instructed appellant not to speak until he met with a
lawyer. However, the trial court found these two witnesses not credible, and
specifically found appellant's mother's testimony concerning appellant's request for
a lawyer to be untrue. Furthermore, Deputy Barnett testified at trial that, despite
some memory loss, he had a full memory of the events in question, and that appellant
never requested a lawyer. 

 Accordingly, we hold that the trial court did not abuse its discretion in denying
appellant's motion to suppress his videotaped statement on the ground that he asked
for a lawyer prior to giving his statement.

 We overrule appellant's second point of error.

Express waiver of legal rights

 In regard to appellant's third point of error, appellant asserts that his
videotaped statement does not show that he expressly waived his legal rights. Article
38.22(3)(a)(2) provides: No oral or sign language statement of an accused made as a result
of custodial interrogation shall be admissible against the accused in a
criminal proceeding unless:


(2) prior to the statement but during the recording the accused is given
the warning in Subsection (a) of Section 2 above and the accused
knowingly, intelligently, and voluntarily waives any rights set out in the
warning.

 

Tex. Code Crim. Proc. Ann. art. 38.22(3)(a)(2) (Vernon Supp. 2005). 

 The State notes that the trial court expressly found that appellant "intelligently,
knowingly, and voluntarily waive[d] those rights as set out in Paragraph 3 [of the trial
court's findings of fact] on his videotaped statement." The State further asserts that
article 38.22 does not provide that a waiver of rights must be expressly stated on the
recording and that, even assuming that the videotaped statement contained no express
waiver, appellant impliedly waived his rights by continuing with the interview after
he had been given the statutory warnings. 

 Our review of the videotaped statement supports the trial court's finding that
appellant "intelligently, knowingly, and voluntarily waive[d] those rights as set out
in Paragraph 3 [of the trial court's findings of fact] on his videotaped statement." 
Furthermore, as appellant concedes, the Court of Criminal Appeals has held that "the
law does not require that the recording reflect an express waiver of [legal] rights." 
Rocha v. State, 16 S.W.3d 1, 12 (Tex. Crim. App. 2000) (citing Etheridge v. State,
903 S.W.2d 1, 16 (Tex. Crim. App. 1994)). Appellant does not contend that his
videotaped statement was otherwise involuntary. Accordingly, we hold that the trial
court did not err in denying appellant's motion to suppress his videotaped statement
on the ground that his statement did not contain an express waiver of his legal rights. 

 We overrule appellant's third point of error.

Ineffective Assistance

 In his fourth and fifth points of error, appellant argues that his trial counsel was
ineffective because he failed to object to inadmissible victim-character testimony and
to the admission of hearsay documents. 

 Appellant complains that during the guilt phase of trial, the complainant's wife
testified that the complainant had five children, ages four to eleven, that the
complainant had studied civil and electrical engineering, that he was Catholic and
went to Mass every day, that he would take his children to Mass, that he would drop
his children off at school, and that he would stay home with his children when they
were sick. Appellant also complains about the admission of a document from the
Bureau of Alcohol, Tobacco, and Firearms (ATF) showing that the gun used to kill
the complainant was owned by the mother of one of appellant's co-defendants and the
testimony of Houston Police Officer R. Moreno establishing the same facts
concerning the ownership of the gun used in the murder. 

 The standard of review for evaluating claims of ineffective assistance of
counsel is set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052,
2064 (1984). Strickland requires a two-step analysis whereby appellant must show
both that (1) counsel's performance fell below an objective standard of
reasonableness, and (2) but for counsel's unprofessional error, there is a reasonable
probability that the result of the proceedings would have been different. Strickland,
466 U.S. at 687, 104 S. Ct. at 2064; Vasquez v. State, 830 S.W.2d 948, 949 (Tex.
Crim. App. 1992). Strickland defines reasonable probability as a "probability
sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at
2068. It is appellant's burden to prove ineffective assistance, and he must overcome
the strong presumption that, under the circumstances, the challenged action might be
considered sound trial strategy. Gamble v. State, 916 S.W.2d 92, 93 (Tex.
App.--Houston [1st Dist.] 1996, no pet.). Additionally, an ineffective assistance
claim must be "firmly founded in the record," and "the record must affirmatively
demonstrate" the meritorious nature of the claim. Thompson v. State, 9 S.W.3d 808,
813 (Tex. Crim. App. 1999). 

 Here, no motion for new trial was filed, and there is nothing in the record that
evidences appellant's trial counsel's reasons for not objecting to the "character
testimony" or the hearsay. In regard to the testimony from the complainant's wife,
the State asserts that such testimony was not impermissible victim impact evidence
because it does not show the physical or psychological effect of the crime on the
victim or his family. In Matchett v. State, 941 S.W.2d 922, 931 (Tex. Crim. App.
1996), the Court of Criminal Appeals held that testimony from a victim's wife that
she and the victim had been married for twenty-five years, that they had five children,
and that the victim was home alone on the night of his murder, together with
photographs depicting her, her husband, and some of their friends was not
impermissible victim impact evidence. Here, appellant's trial counsel may have
considered the complained of testimony admissible or that an objection to such
testimony would be futile. In regard to the hearsay, the State notes that appellant does
not contend that the ownership of the murder weapon was not provable by other
means. Appellant's trial counsel may have determined that the State could have
proved the ownership of the weapon with additional evidence that would have
subjected appellant to evidence of a more prejudicial nature. Generally, isolated
failures to object to improper evidence generally do not constitute ineffective
assistance of counsel. Ingham v. State, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984). 
Accordingly, we hold that appellant has not established that his trial counsel's
performance fell below an objective standard of reasonableness. 

 We overrule appellant's fourth and fifth points of error.

 Conclusion


 We affirm the judgment of the trial court.



 Terry Jennings

 Justice


Panel consists of Justices Jennings, Hanks, and Higley. 


Do not publish. Tex. R. App. P. 47.2(b).
1. See Tex. Pen. Code Ann. § 19.03(a)(7)(A) (Vernon Supp. 2005).
2. Id. § 12.31(a) (Vernon Supp. 2005); Tex. Code Crim. Proc. Ann. art. 37.071, § 1
(Vernon Supp. 2005).